## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO.:** |
| | : | |
| v. | : | **VIOLATION:** |
| | : | |
| **ROBERT S. BROWN,** | : | **18 U.S.C. § 1503** |
| | : | **OBSTRUCTION OF THE DUE** |
| **Defendant.** | : | **ADMINISTRATION OF JUSTICE** |
| | : | |

## INFORMATION

The United States Attorney charges:

### COUNT ONE
#### (Obstruction of the Due Administration of Justice)

**A.      Introduction**

1.      From 1990 through the present, the defendant, ROBERT S. BROWN, was an attorney licensed to practice law in the State of New York. From in or about 1995 through in or about August 2009, BROWN practiced law as a partner in a law firm in New York, New York. BROWN's legal practice focused on representing companies, investment banks, private equity and debt investors in corporate finance transactions, including public offerings, private placements, bridge, mezzanine and venture financing and mergers and acquisitions.

**B.      Relevant Individuals and Entities**

2.      Company A was a business that provided financial information products focused on China's financial markets, and was an integrated provider of market indices, ratings, financial news and analysis and investor relations for China. Company A was headquartered in China. Company A's Chief Executive Officer was a person hereinafter referred to as Businessperson A-1. A member

of Company A's Board of Directors was a person hereinafter referred to as Businessperson A-2. In or around April 2004, Company A began to make filings with the United States Securities and Exchange Commission ("SEC") in the District of Columbia concerning the offering and sale of its securities. On or around October 28, 2004, Company A's shares began to trade on the Mothers Board (market of the high-growth and emerging stocks) of the Tokyo Stock Exchange. In or around July 2005, Company A established a sponsored Level 1 American Depository Receipt ("ADR") facility to trade its equity on the Over the Counter market in the United States.

3.     Company B was an investment banking firm headquartered in Newport Beach, California. Beginning in or about 2003, Company B provided investment banking services to Company A. Company B's Chair and Chief Executive Officer was a person hereinafter referred to as Businessperson B-1. From in or about June 2004 through in or about May 2007, Businessperson B-1 was a member of the Board of Directors of Company A. Company B's President and Managing Director was a person hereinafter referred to as Businessperson B-2.

4.     From in or about January 2004 through in or about January 2008, at the direction of Businessperson B-1, BROWN facilitated the formation of several limited liability companies ("LLCs"), among other purposes, to receive cash, credit, a warrant and stock from Company A. Once formed, Businessperson B-1 directed BROWN to prepare documents as part of several financial transactions to cause Company A and Company A's predecessor entity to transmit cash, credit, a warrant and stock to the LLCs under false pretenses. The documents caused Company A and Company A's predecessor entity to transmit, collectively, over $25 million to the LLCs in the form of cash, credit, a warrant and stock. At Businessperson B-1's direction, BROWN facilitated the distribution of the cash, credit, warrant and stock from the LLCs for the primary benefit of

2

Businessperson A-1, Businessperson A-2 and Businessperson B-1. Company A's filings with the SEC did not disclose and misrepresented the cash, credit, warrant and stock transmitted to the LLC's for the primary benefit of Businessperson A-1, Businessperson A-2 and Businessperson B-1.

5.      On or about April 5, 2004, BROWN facilitated the formation of LLC D. BROWN used the name of one of his close family members to be the owner of LLC D. On or around April 1, 2005, at a time when BROWN's close family member no longer owned LLC D, Businessperson B-1 directed BROWN to prepare and transmit a letter to Company A's predecessor entity that caused Company A's predecessor entity to credit approximately $3,611,111.00 to LLC D under false pretenses. The primary beneficiaries of the credit were Businessperson A-1, Businessperson A-2 and Businessperson B-1.

6.      Company E was initially a non-public business engaged in providing skilled high technology personnel and other staffing services. Company B provided investment banking services to Company E.

7.      In or around June 2004, Company E acquired the shares of a publicly traded company through a reverse merger. Thereafter, Company E's shares began to trade on the Over the Counter ("OTC") Bulletin Board, an electronic price quotation system primarily used for the trading of the securities of corporations that do not meet the listing requirements of a national securities exchange. At the time of the reverse merger, LLC D owned 300,000 shares of Company E.

8.      BROWN knew from conversations with Businessperson B-1 and Businessperson B-2 that Company B controlled a block of shares of Company E. Businessperson B-1 and Businessperson B-2 wanted to promote the shares of Company E. On or about June 18, 2004, at the direction of Businessperson B-1, LLC D entered into a contract with a company that provided public

3

relations services, hereinafter referred to as Company F. BROWN executed the contract on behalf of LLC D. Pursuant to the contract, Company F agreed to prepare and publish an investment newsletter to promote the shares of Company E and to distribute the newsletter to 390,000 potential investors. On or about June 30, 2004, at the direction of Businessperson B-1 and Businessperson B-2, BROWN approved a direct mail publication that promoted the shares of Company E. BROWN understood that Company B, Businessperson B-1 and Businessperson B-2 used LLC D to conceal their financing of and involvement in the direct mail campaign from regulators and others.

9.      In or about September 2004, at the direction of Businessperson B-1, BROWN facilitated the opening of a bank account for LLC D at a financial institution located in Indianapolis, Indiana. After opening the bank account, BROWN knew that monies were being deposited into the account from sources associated with Company B and Businessperson B-1. At the direction of Company B, Businessperson B-1 and Businessperson B-2, BROWN signed wire transfer requests on behalf of LLC D directing monies out of the account to pay for the public relations campaign promoting the shares of Company E.

10.     From in or about July 2004 through in or about December 2004, LLC D sold its 300,000 shares of Company E for total proceeds of approximately $200,000.00. Company B primarily directed the selling of the shares in the account. BROWN kept approximately $69,000.00 of the proceeds for himself and wired the remainder to Company B.

C.      **The Grand Jury Investigation**

11.     On or about October 23, 2007, agents from the Federal Bureau of Investigation visited the residence of the close family member of BROWN's who had been designated by BROWN as the owner of LLC D. The agents interviewed BROWN's close family member. During the

4

interview, BROWN placed a telephone call to his close family member. During the call, BROWN consented to a telephone interview with the agents. The agents informed BROWN that they were conducting a criminal investigation. The agents asked BROWN, among other things, about LLC D. BROWN falsely stated to the agents that the sole purpose of LLC D had been to segregate the trading profits made by BROWN and his close family member from the sale of Company E's shares when, in truth and in fact, BROWN knew that LLC D had been used, among other purposes, to facilitate a surreptitious campaign to promote the stock of Company E. At the conclusion of the telephone interview, BROWN suggested that the agents conduct a follow-up interview with BROWN.

12.     On or about December 17, 2007, agents from the Federal Bureau of Investigation conducted the follow-up interview with BROWN in person at his law office in New York, New York. BROWN knew the agents were acting in connection with a criminal investigation arising in the District of Columbia concerning, among other things, LLC D. During the interview, BROWN falsely stated to the agents that BROWN's dealings with Businessperson B-1 had always been honest when, in truth and in fact, BROWN knew that Businessperson B-1 had engaged in several fraudulent transactions, including transactions in which Businessperson B-1 used LLC D to facilitate a surreptitious campaign to promote the stock of Company E and caused Company A and Company A's predecessor entity to transmit things of value for the benefit of Businessperson B-1 under false pretenses. BROWN made his false and misleading statements to the agents endeavoring to curtail the scope, duration and direction of the criminal investigation.

13.     On or about January 16, 2008, agents from the Federal Bureau of Investigation and prosecutors from the United States Attorney's Office for the District of Columbia interviewed BROWN in person at the United States Attorney's Office in the District of Columbia. BROWN

knew the interview was in connection with a grand jury investigation in the District of Columbia. BROWN intended the information he conveyed to the agents and prosecutors to be conveyed to the grand jury sitting in the District of Columbia through his own testimony and the testimony of the agents. During the interview, BROWN falsely stated that the potential for LLC D to be part of a fraudulent pump and dump securities transaction involving the stock of Company E would not have been apparent to BROWN because, among other reasons, BROWN trusted Businessperson B-1 to engage in honest transactions when, in truth and in fact, BROWN knew that Businessperson B-1 had engaged in several fraudulent transactions, including transactions in which Businessperson B-1 used LLC D to facilitate a surreptitious campaign to promote the stock of Company E and caused Company A and Company A's predecessor entity to transmit things of value for the benefit of Businessperson B-1 under false pretenses. BROWN made his false and misleading statements endeavoring to curtail the scope, duration and direction of the grand jury investigation.

### D.    Endeavoring to Influence the Due Administration of Justice

14.    On or about January 16, 2008, in the District of Columbia, the defendant, ROBERT S. BROWN, did corruptly endeavor to influence, obstruct and impede the due administration of justice by providing false statements to agents from the Federal Bureau of Investigation and prosecutors from the United States Attorney's Office for the District of Columbia , knowing that the false statements were made in connection with an on-going grand jury investigation in the District of Columbia and intending the false statements to be conveyed to the grand jury, that the potential for LLC D to be part of a fraudulent pump and dump securities transaction involving the stock of Company E would not have been apparent to BROWN because BROWN trusted Businessperson B-1 to engage in honest transactions when, in truth and in fact, BROWN knew that Businessperson B-1

had engaged in a fraudulent campaign to promote the stock of Company E and caused Company A and Company A's predecessor entity to transmit things of value for the benefit of Businessperson B-1 under false pretenses.

**Obstruction of the Due Administration of Justice, in violation of Title 18, United States Code, Section 1503.**

CHANNING D. PHILLIPS
Acting United States Attorney
In and For the District of Columbia

By:

MICHAEL K. ATKINSON
VASU B. MUTHYALA
Assistant United States Attorneys
KESHIA WEST
Special Assistant United States Attorney
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C. 20530
202.616.3702 (Atkinson)
202.514.7541 (Muthyala)
202.353.9458 (West)
Michael.Atkinson2@usdoj.gov
Vasu.Muthyala@usdoj.gov
Kwest2@usa.doj.gov

DATED: October 15, 2009

7