**FILED**

NOV 0 3 2009

NANCY MAYER WHITTINGTON, CLERK
U S DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.:** $09 - CR - 00267 (HHK)$ |
| | : | |
| v. | : | **VIOLATION:** |
| | : | |
| **ROBERT S. BROWN,** | : | **18 U.S.C. § 1503** |
| | : | **OBSTRUCTION OF THE DUE** |
| Defendant. | : | **ADMINISTRATION OF JUSTICE** |
| | : | |

**STATEMENT OF THE OFFENSE**

**I.     Background**

1.     From 1990 through the present, the defendant, ROBERT S. BROWN, was an attorney licensed to practice law in the State of New York. From in or about 1995 through in or about August 2009, BROWN practiced law as a partner in a law firm in New York, New York. BROWN's legal practice focused on representing companies, investment banks, private equity and debt investors in corporate finance transactions, including public offerings, private placements, bridge, mezzanine and venture financing and mergers and acquisitions.

**II.     Company A**

2.     Company A was a business that provided financial information products focused on China's financial markets, and was an integrated provider of market indices, ratings, financial news and analysis and investor relations for China. Company A was headquartered in China. Company A's Chief Executive Officer was a person hereinafter referred to as Businessperson A-1. A member of Company A's Board of Directors was a person hereinafter referred to as Businessperson A-2. On or around October 28, 2004, Company A's shares began to trade on the Mothers Board (market of the high-growth and emerging stocks) of the Tokyo Stock Exchange.

3.      Company B was an investment banking firm headquartered in Newport Beach, California.  Beginning in or about 2003, Company B provided investment banking services to Company A.  Company B's Chair and Chief Executive Officer was a person hereinafter referred to as Businessperson B-1.  From in or about June 2004 through in or about May 2007, Businessperson B-1 was a member of the Board of Directors of Company A.  Company B's President and Managing Director was a person hereinafter referred to as Businessperson B-2.

4.      From in or about January 2004 through in or about January 2008, at the direction of Businessperson B-1, BROWN facilitated the formation of several limited liability companies ("LLCs"), among other purposes, to receive cash, credits, warrants and stock from Company A and Company A's predecessor entity.  Once formed, Businessperson B-1 directed BROWN to prepare documents as part of several financial transactions to cause Company A and Company A's predecessor entity to transmit cash, a credit, a warrant and stock to the LLCs under false pretenses. The documents caused Company A and Company A's predecessor entity to transmit, collectively, over $25 million to the LLCs in the form of cash, credit, a warrant and stock.  At Businessperson B-1's direction, BROWN facilitated the distribution of the cash, credit, warrant and stock from the LLCs for the primary benefit of Businessperson A-1, Businessperson A-2 and Businessperson B-1.

**A.      LLC A**

5.      On or around April 20, 2004, Businessperson B-1 directed BROWN to form a limited liability company, hereinafter referred to as LLC A.  Businessperson B-1 directed BROWN to identify Nominee A as the principal officer of LLC A.  Nominee A had no obvious connection to Company B or Businessperson B-1.  BROWN knew that Nominee A was associated with Businessperson B-1.  BROWN also knew that an ownership interest in LLC A went from a lawyer,

2

Melissa A. Mahler, to Nominee A. Mahler was an attorney licensed to practice law in the State of New York who had participated in other business transactions involving BROWN, Businessperson B-1 and Nominee A.

6.    In or around July 2004, at Businessperson B-1's direction, LLC A entered into a Warrant to Purchase Ordinary Shares with Company A, effective October 1, 2004, hereinafter referred to as the "Warrant Agreement." Pursuant to the Warrant Agreement, LLC A obtained the right to purchase 13,888,888 shares of Company A at an exercise price of $0.36 per share. Businessperson A-1 executed the Warrant Agreement on behalf of Company A. Nominee A executed Exhibit A to the Warrant Agreement, referred to as the "Notice of Exercise, [Company A], Subscription Form," which reflected LLC A's exercise of its right to purchase 13,888,888 shares of Company A at an Exercise Price of $0.36 a share for a total amount of $4,999,999.68.

7.    On or around March 28, 2005, at Businessperson B-1's direction, BROWN prepared an Amended and Restated Limited Liability Company Agreement for LLC A, hereinafter referred to as the "Amendment." As directed by Businessperson B-1, the Amendment identified BROWN as the sole manager of LLC A. The Amendment authorized BROWN to execute on behalf of LLC A the "Notice of Exercise, [Company A], Subscription Form attached as Exhibit A to [Company A] Warrant to Purchase Ordinary Shares, Effective October 1, 2004." The Notice of Exercise referred to in the Amendment was identical to the Notice of Exercise that Nominee A had executed in or around July 2004. As directed by Businessperson B-1, BROWN signed BROWN's name to the Notice of Exercise as the "Manager" of LLC A. Pursuant to the Notice of Exercise, LLC A exercised its right to purchase 13,888,888 ordinary shares of Company A at an Exercise Price of $0.36 a share and agreed to pay Company A the sum of $4,999,999.68. Because of a 1-for-2000

3

reverse stock split approved by Company A's shareholders in or around August 2004, the 13,888,888 ordinary shares of Company A referenced in the Warrant Agreement were reduced to 6944 shares of Company A and the Exercise Price was increased from $0.36 a share to $720.00 a share.

8.      To pay $3,611,111.00 of the $4,999,999.68 Exercise Price owed by LLC A to Company A under the Warrant Agreement, Businessperson B-1 directed BROWN to prepare and execute a series of fraudulent letter agreements.  At Businessperson B-1's direction, BROWN prepared a letter, dated April 1, 2005 (hereinafter referred to as the "Commitment Agreement"), addressed to Company A's predecessor entity from a limited liability company, hereinafter referred to as LLC D.  On or about April 5, 2004, BROWN facilitated the formation of LLC D.  BROWN used the name of one of his close family members to be the owner of LLC D.  At the time of the Commitment Letter, BROWN's close family member no longer owned LLC D.

9.      The Commitment Agreement referred to "the Agreement, dated April 5, 2004 (the 'Finders Agreement')," between LLC D and Company A's predecessor entity.  The Commitment Agreement stated that "[d]uring the year ended December 31, 2004, [Company A's predecessor entity] consummated Transactions as a result of which [Company A's predecessor entity] is obligated to pay to [LLC D] approximately US$2,000,000 pursuant to, and in accordance with Section 2 of the [Commitment] Agreement."  Section 2 of the Commitment Agreement stated, in pertinent part, that LLC D "hereby irrevocably commits (the 'Commitment') to provide to [Company A's predecessor entity] Transactions with consideration in the amount of at least US$10,000,000."  Section 3 of the Commitment Agreement stated that, in exchange for the "Commitment," Company A's predecessor company "hereby agrees to provide [LLC D] with US $3,611,111." BROWN knew that the "Finders Agreement" referenced in the Commitment Agreement did not, in fact, exist as of

4

April 5, 2004, and that LLC D had not, in fact, provided any services to Company A and Company A's predecessor company.

10.     At Businessperson B-1's direction, BROWN prepared and executed a second letter, dated April 1, 2005, from LLC D to Company A's predecessor entity. The second letter referred to the Commitment Agreement and authorized Company A's predecessor entity "to deliver the amount referenced in Section 3 of the Commitment Agreement payable to [LLC D, *i.e.*, $3,611,111.00,] to, or as directed by, [LLC A], a Delaware limited liability company." BROWN knew that LLC D had no legitimate claim to the $3,611,111.00 referenced in the second letter.

11.     At Businessperson B-1's direction, BROWN prepared a third letter, dated April 1, 2005, from LLC A to Company A. The third letter referred to the Commitment Agreement and the Warrant Agreement. The third letter directed Company A "to apply the amounts referenced in Section 3 of the Commitment Agreement payable to [LLC D, *i.e.*, $3,611,111.00] in partial payment of the [$4,999,999.68] Exercise Price of the Warrant." As a result of the fraudulent letters, Company A credited LLC D with $3,666,111.00 as partial payment of the $4,999,999.68 due pursuant to the Warrant Agreement.

12.     On or around March 29, 2005, as directed by Businessperson B-1, BROWN executed an account application for an account in the name of LLC A at a financial institution in New York, New York, hereinafter referred to as Financial Institution A. The application identified BROWN as LLC A's "principal officer." The mailing address identified on the application for LLC A was Company B's principal place of business.

13.     On or around April 6, 2005, the 6944 shares of Company A obtained by LLC A were deposited into LLC A's account at Financial Institution A.

5

14.     On or around April 18, 2005, at Businessperson B-1's direction, BROWN executed an account application for an account in the name of LLC A at a financial institution in Indianapolis, Indiana, hereinafter referred to as Financial Institution B. The application identified BROWN as LLC A's "manager." The mailing address identified on the application for LLC A was Company B's principal place of business.

15.     As the transaction progressed, BROWN recognized that LLC A was a shell company whose sole economic purpose was to receive the stock from Company A and to re-distribute the proceeds from the sale of the stock for the primary benefit of Businessperson A-1, Businessperson A-2 and Businessperson B-1. From on or around April 4, 2005 through in or around January 2006, at the direction of Company B, including Businessperson B-1 and Businessperson B-2, LLC A sold the shares of Company A obtained through the Warrant Agreement. The shares generated proceeds of approximately $20,000,000.00. At the direction of Company B, including Businessperson B-1 and Businessperson B-2, BROWN facilitated the transfer of those proceeds from LLC A's account at Financial Institution A to LLC A's account at Financial Institution B. BROWN understood there was no economic purpose served by transferring those proceeds from Financial Institution A to Financial Institution B. At the direction of Company B, including Businessperson B-1 and Businessperson B-2, BROWN facilitated the transfer of the proceeds from LLC A's account at Financial Institution B for the primary benefit of Businessperson A-1, Businessperson A-2 and Businessperson B-1. On or about April 21, 2005, BROWN received $100,000.00 of the proceeds from LLC A.

6

**B.     LLC E**

16.     At the direction of Businessperson B-1, BROWN engaged in four fraudulent transactions involving the creation and use of a limited liability company, hereinafter referred to as LLC E. As the transaction progressed, BROWN recognized that LLC E was a shell company whose sole economic purpose was to receive cash from Company A and to re-distribute the cash for the benefit of Businessperson A-1, Businessperson A-2, Businessperson B-1, Businessperson B-2 and BROWN.

**1.     LLC E - The First Transaction**

17.     On or around January 23, 2006, at the direction of Businessman B-1, BROWN facilitated the formation of LLC E. On or around January 25, 2006, Businessman B-1 sent an email to BROWN stating "[i]f [BROWN] would like to receive an additional $30 grand, I would ask that you get a [LLC E] bank account opened so we can send in some dough." On or around January 26, 2006, as Businessman B-1 had directed, BROWN executed an account application for LLC E at Financial Institution B.

18.     On or about February 3, 2006, Company A's predecessor entity wired $1,368,463.42 to LLC E's account at Financial Institution B. BROWN was unaware of any services provided by LLC E to Company A or Company A's predecessor entity. Nevertheless, at the direction of Businessperson B-1, BROWN proceeded to facilitate the distribution of those monies for the benefit of Businessperson A-2, Businessperson B-1 and BROWN.

19.     On or about February 10, 2006, at Businessman B-1's direction, BROWN facilitated the transfer of $37,792.03 from LLC E's account at Financial Institution B to a bank account for the

benefit of an attorney associated with Businessperson A-2.  BROWN was unaware of any services provided by LLC E to Businessperson A-2.

20.     On or about February 14, 2006, Company B prepared and submitted an "Invoice" to BROWN from a limited liability company, hereinafter referred to as LLC F.  LLC F was controlled by Businessperson B-1.  The Invoice sought payment of $1,290,671.39 from LLC E for "consulting services" purportedly provided by LLC F to LLC E.  BROWN knew that the Invoice was false because, in fact, LLC F had provided no consulting services to LLC E.  Nevertheless, on or about February 16, 2006, pursuant to the Invoice and at the direction of Businessperson B-1, BROWN facilitated the transfer of $1,290,671.39 from LLC E's account at Financial Institution B to LLC F's account at Financial Institution B.  Also on or about February 16, 2006, BROWN facilitated the transfer of $39,900.00 from LLC E's account at Financial Institution B to BROWN's personal account.  Other than certain administrative tasks, such as forming the LLC and facilitating the transfer of funds into and out of LLC E's account at Financial Institution B, BROWN provided no services to LLC E.

**2.     LLC E - The Second Transaction**

21.     On or about May 23, 2006, at the direction of Businessperson B-1, Company A wired $1,050,000.00 to LLC D's bank account at Financial Institution B.  BROWN was unaware of any services provided by LLC D or LLC E to Company A.  As directed by Businessperson B-1, BROWN facilitated the transfer of $1,000,000.00 from those funds to Businessperson A-1.  BROWN was unaware of any services provided by Businessperson A-1 to LLC D or LLC E.  Nevertheless, at Businessperson B-1's direction, BROWN prepared a set of false, back-to-back consulting contracts to transfer the $1,000,000.00 to Businessperson A-1.

8

22.    In or around early June 2006, at Businessperson B-1's direction, BROWN prepared a letter agreement between LLC E and a company based in Austria, hereinafter referred to as Company G.  Pursuant to the letter agreement, LLC E retained Company G to provide consulting services.  In consideration for the consulting services, LLC E agreed to pay Company G the sum of $1,000,000.00.  BROWN knew the letter agreement was false because, in fact, Company G would not and did not provide consulting services to LLC E.  Instead, the letter agreement was a pretext to transfer monies to Businessperson A-1.  BROWN, on behalf of LLC E, executed the letter agreement with Company G.

23.    At the same time, in or around June 2006, at Businessperson B-1's direction, BROWN prepared a similar letter agreement between Company G and Businessperson A-1.  Pursuant to the letter agreement, Company G retained Businessperson A-1 to provide consulting services.  The consulting services to be provided by Businessperson A-1 to Company G were identical to the consulting services to be provided by Company G to LLC E.  In consideration for the consulting services, Company G agreed to pay Businessperson A-1 the sum of $1,000,000.00.  BROWN knew the letter agreement was false because, in fact, Businessperson A-1 would not and did not provide consulting services to Company G.  Instead, the letter agreement was a pretext to transfer monies to Businessperson A-1.  On or about June 5, 2006, Businessperson A-1 caused BROWN to receive the wire instructions for Businessperson A-1's personal bank account in China for purposes of receiving the $1,000,000.00 payment.  On or about June 7, 2006, Businessperson A-1 executed the letter agreement between Businessperson A-1 and Company G in New York, New York.

24.     On or about June 8, 2006, at Businessperson B-1's direction, BROWN facilitated the transfer of $1,000,000.00 from LLC D's account at Financial Institution B to LLC E's account at Financial Institution B.

25.     On or about June 9, 2006, at Businessperson B-1's direction, BROWN facilitated the transfer of $1,000,000.00 from LLC E's account at Financial Institution B to Company G's account in Austria.  BROWN subsequently informed Businessperson B-2 that Company G had, in turn, transmitted the funds to Businessperson A-1.

26.     On or about June 9, 2006, at Businessperson B-1's direction, BROWN facilitated the transfer of $49,900.00 from LLC E's account at Financial Institution B to BROWN's personal account.  Other than certain administrative tasks, such as forming the LLC and facilitating the transfer of funds into and out of LLC E's account at Financial Institution B, BROWN provided no services to LLC E.

### 3.     LLC E - The Third Transaction

27.     On or about August 4, 2006, Company A's Director of Accounting and Reporting sent an email to BROWN, with a copy to Businessperson B-1 and Company A's Chief Financial Officer, requesting that BROWN prepare a letter from LLC E "as of Jun/30/06" waiving the "commission" due to LLC E from Company A's predecessor entity "on a one time basis due to good ongoing business relationship with" Company A's predecessor entity.

28.     In response to that request, at Businessperson B-1's direction, BROWN prepared and executed a letter on behalf of LLC E addressed to Company A's predecessor entity.  BROWN dated the letter "June 30, 2006," even though BROWN had not prepared the letter until on or around August 4, 2006. The letter referenced $286,179.60 in fees due from Company A's predecessor entity

10

"for services heretofore rendered by" LLC E. The letter stated that "[a]s a result of the continuing business relationship between [Company A's predecessor entity] and [LLC E], [LLC E] hereby waives all rights to the" $286,179.60. BROWN was unaware of any legitimate services provided by LLC E to Company A or Company A's predecessor company.

### 4.   LLC E - The Fourth Transaction

29.   On or about December 15, 2006, at the direction of Businessperson B-1 and with the approval of Businessperson A-1, Company A *is predecessor entity* wired approximately $1,883,117.00 to LLC E's account at Financial Institution B. BROWN was unaware of any services provided by LLC E to Company A *is predecessor entity*. Nevertheless, at the direction of Businessperson B-1, BROWN proceeded to facilitate the distribution of those monies for the benefit of Businessperson A-1, Businessperson B-1, Businessperson B-2 and BROWN.

30.   On or about December 15, 2006, at the direction of Businessperson B-1, BROWN facilitated the transfer of $683,117.00 from LLC E's account at Financial Institution B to an account controlled by Businessperson B-1. BROWN was unaware of any services provided by Businessperson B-1 to LLC E.

31.   On or about December 18, 2006, at the direction of Businessperson B-1 and Businessperson B-2, BROWN facilitated the transfer of $200,000.00 from LLC E's account at Financial Institution B to an account controlled by Businessperson B-2. Also on or about December 18, 2006, at the request of Businessperson B-1 and Businessperson B-2, BROWN facilitated the transfer of $12,500.00 from LLC E's account at Financial Institution B to an account for the benefit of Businessperson B-2. BROWN was unaware of any services provided by Businessperson B-2 to LLC E.

32.     On or about December 18, 2006, at the direction of Businessperson B-1, BROWN facilitated the transfer of $199,900.00 from LLC E's account at Financial Institution B to BROWN's personal account. Other than certain administrative tasks, such as forming the LLC and facilitating the transfer of funds into and out of LLC E's account at Financial Institution B, BROWN provided no services to LLC E.

33.     On or about December 29, 2006, at the direction of Businessperson B-1, BROWN facilitated the transfer of $800,000.00 from LLC E's account at Financial Institution B to a limited liability company hereinafter referred to as LLC G. The wire transfer request executed by BROWN referenced a "consulting fee; paid in full." BROWN knew the wire transfer request was false because, in truth and in fact, LLC G had provided no consulting fees to LLC E. At the direction of Businessperson B-1, BROWN had facilitated the formation of LLC G on or about December 14, 2006. The owner of LLC G was Businessperson B-2. BROWN was unaware of any services provided by LLC G to LLC E.

**C.     LLC H**

34.     On or around April 4, 2006, at the direction of Businessperson B-1, BROWN facilitated the formation of a limited liability company, hereinafter referred to as LLC H. The initial owners of LLC H were BROWN and an individual associated with Businessperson A-2, hereinafter referred to as Nominee B.

35.     On or about August 31, 2006, Company A's Director of Accounting and Reporting sent an email to BROWN, with a copy to Businessperson B-1, Company A's Chief Financial Officer, and Company A's General Counsel. The email stated, among other things, that Company A was "looking to issue" shares of Company A to LLC H to "satisfy[] the consulting service that [LLC H]

has rendered to" Company A relating to Company A's acquisition of a subsidiary in January 2006. The email requested that BROWN provide, among other things, an invoice from LLC H to Company A "for such service."

36.     In response, at the direction of Businessperson B-1, BROWN prepared a letter from LLC H to Company A, dated September 1, 2006.  The letter stated, among other things, that "[f]or the period from July 4, 2005 through January 31, 2006, the predecessor of [LLC H] performed services on behalf of [Company A] with respect to transactions relating to" the acquisition of one of Company A's subsidiaries.  The letter stated that "[i]n recognition of the services heretofore rendered by [LLC H] to [Company A], [Company A] shall deliver to [LLC H], as soon as reasonably practicable following the execution and delivery hereof, a total of 17,233 ordinary shares of [Company A] whereby 872 ordinary shares shall be freely tradable and the remaining 16,361 ordinary shares shall be restricted from sale for a period of five years."  BROWN knew the letter was false in that LLC H had no "predecessor," and that neither LLC H nor its purported "predecessor" had provided any services to Company A.

37.     On or about September 5, 2006, at the direction of Businessperson B-1, BROWN sent an email to Company A's Director of Accounting and Reporting as well as Businessperson B-1 attaching an invoice from LLC H to Company A.  The invoice, dated July 31, 2006, identified the principal place of business of LLC H as the home address of Nominee B in Hollywood, California. The invoice referred to the "Client" as Company A, the "Dates of Service" as "Through July 31, 2006," and the "Matter" as "Consulting service related to the structuring of the acquisition of [Company A's subsidiary]; Transaction in January 2006." The invoice did not identify a dollar value for the services provided, but instead stated that "[i]n lieu of the requisite cash payment, [LLC H]

agrees to accept an aggregate of 17,233 ordinary shares of [Company A] (where 15,561 shares are to be locked up for 5 years and 1,672 shares are freely tradable)." BROWN knew the invoice was false in that LLC H had provided no services to Company A.

38.     On or about September 19, 2006, at Company A's request and Businessperson B-1's direction, BROWN revised the invoice from LLC H to Company A to add an additional 800 shares of Company A as LLC H's compensation. The revised invoice (still dated July 31, 2006) reflected an amount due of $5,084,617, but stated that "[i]n lieu of the requisite cash payment, [LLC H] agrees to accept an aggregate of 17,233 ordinary shares of [Company A] (where 15,561 shares are to be locked up for 5 years and 1,672 shares are freely tradable)."

39.     At the direction of Businessperson B-1, BROWN prepared an Assignment agreement, dated as of October 1, 2006, between LLC H and Businessperson A-1. Pursuant to the Assignment, "[f]or due and valid consideration," LLC H assigned to Businessperson A-1 "all of [LLC H's] rights, title, and interest in, to and under all consideration to which [LLC H] is entitled under and pursuant to the Letter Agreement, dated as of September 1, 2006, between [LLC H] and [Company A]." BROWN was unaware of any consideration paid by Businessperson A-1 to LLC H for the 17,233 shares of Company A being assigned to Businessperson A-1 from LLC H. As the transaction progressed, BROWN recognized that LLC H was a shell company whose sole economic purpose was to receive the stock from Company A and to re-distribute the stock for the primary benefit of Businessperson A-1.

40.     On or about November 2, 2006, at the direction of Businessperson A-2 and Businessperson B-1, BROWN facilitated the opening of an account for LLC H at Financial Institution A. BROWN knew the primary beneficiary of the assets controlled by LLC H was

14

Businessperson A-1. Nevertheless, the LLC agreement submitted along with the account application for LLC H by BROWN to Financial Institution A identified the owners of LLC H as BROWN and Nominee B.

### III.   Company E

41.     Company E was initially a non-public business engaged in providing skilled high technology personnel and other staffing services. Company B provided investment banking services to Company E.

42.     On or about April 5, 2004, BROWN facilitated the formation of LLC D. BROWN used the name of one of his close family members to be the managing member of LLC D.

43.     In or around June 2004, Company E acquired the shares of a publicly traded company through a reverse merger. Thereafter, Company E's shares began to trade on the Over the Counter ("OTC") Bulletin Board, an electronic price quotation system primarily used for the trading of the securities of corporations that do not meet the listing requirements of a national securities exchange. At the time of the reverse merger, LLC D owned 300,000 shares of Company E.

44.     BROWN knew from conversations with Businessperson B-1 and Businessperson B-2 that they wanted to promote the shares of Company E. On or about June 18, 2004, at the direction of Businessperson B-1, LLC D entered into a contract with a company that provided public relations services, hereinafter referred to as Company F. BROWN executed the contract on behalf of LLC D. Pursuant to the contract, Company F agreed to prepare and publish an investment newsletter to promote the shares of Company E and to distribute the newsletter to 390,000 potential investors. On or about June 30, 2004, at the direction of Businessperson B-1 and Businessperson B-2, BROWN approved a direct mail publication that promoted the shares of Company E. BROWN understood

15

that Company B, Businessperson B-1 and Businessperson B-2 used LLC D to conceal their financing of and involvement in the direct mail campaign from regulators and others.

45.     In or about September 2004, at the direction of Businessperson B-1, LLC D opened a bank account at Financial Institution B.  After opening the bank account, BROWN knew that monies were being deposited into the account from sources associated with Company B and Businessperson B-1.  At the direction of Company B, Businessperson B-1 and Businessperson B-2, BROWN signed wire transfer requests on behalf of LLC D directing monies out of the account to pay for the public relations campaign promoting the shares of Company E.

46.     From in or about July 2004 through in or about December 2004, LLC D's brokerage account sold the 300,000 shares of Company E for total proceeds of approximately $200,000.00. Company B primarily directed the selling of the shares in the account.  BROWN kept approximately $69,000.00 of the proceeds for himself and wired the remainder to Company B.

## IV.     The Grand Jury Investigation

47.     On or about October 23, 2007, agents from the Federal Bureau of Investigation visited the residence of the close family member of BROWN's who had been designated by BROWN as the owner of LLC D.  During the interview, BROWN placed a telephone call to his close family member.  During the call, BROWN consented to a telephone interview with the agents.  The agents informed BROWN that they were conducting a criminal investigation.  The agents asked BROWN, among other things, about LLC D.  BROWN falsely stated to the agents that the sole purpose of LLC D had been to segregate the trading profits made by BROWN and his close family member from the sale of Company E's shares when, in truth and in fact, BROWN knew that LLC D had been used, among other purposes, to facilitate a surreptitious campaign to promote the stock of Company E.

16

At the conclusion of the telephone interview, BROWN suggested that the agents conduct a follow-up interview with BROWN after BROWN had reviewed some relevant documentation.

48.     On or about December 17, 2007, agents from the Federal Bureau of Investigation conducted the follow-up interview with BROWN in person at his law office in New York, New York. BROWN knew the agents were conducing a criminal investigation arising in the District of Columbia concerning, among other things, LLC D. During the interview, BROWN falsely stated to the agents that BROWN's dealings with Businessperson B-1 had always been honest when, in truth and in fact, BROWN knew that Businessperson B-1 had engaged in several fraudulent transactions, including transactions in which Businessperson B-1 used LLC D to facilitate a surreptitious campaign to promote the stock of Company E and caused Company A and Company A's predecessor entity to transmit things of value for the benefit of Businessperson B-1 under false pretenses. BROWN made his false and misleading statements to the agents endeavoring to curtail the scope, duration and direction of the criminal investigation.

49.     On or about January 16, 2008, agents from the Federal Bureau of Investigation and prosecutors from the United States Attorney's Office for the District of Columbia interviewed BROWN in person at the United States Attorney's Office in the District of Columbia. BROWN knew that the information he conveyed to the agents and prosecutors was in connection with the grand jury investigation in the District of Columbia. BROWN intended such information to be conveyed to the grand jury. During the interview, BROWN falsely stated that the potential for LLC D to be part of a fraudulent pump and dump securities transaction involving the stock of Company E would not have been apparent to BROWN because, among other reasons, BROWN trusted Businessperson B-1 to engage in honest transactions when, in truth and in fact, BROWN knew that

17

Businessperson B-1 had engaged in several fraudulent transactions, including transactions in which

Businessperson B-1 used LLC D to facilitate a surreptitious campaign to promote the stock of

Company E and caused Company A and Company A's predecessor entity to transmit things of value

for the benefit of Businessperson B-1 under false pretenses.  BROWN made his false and misleading

statements endeavoring to curtail the scope, duration and direction of the grand jury investigation.

*     *     *     *     *

The preceding statement is a summary, made for the purpose of providing the Court with

a factual basis for my guilty plea to the charges against me.  It does not include all of the facts known

to me regarding this offense.  I make this statement knowingly and voluntarily and because I am in

fact guilty of the crimes charged.

DATE: 10\14\ 09

ROBERT S. BROWN
Defendant

DATE: 10/14/09

DAVID M. ROSENFIELD
Attorney for Defendant

DATE: 10/14/09

ARTHUR G. JAKOBY
Attorney for Defendant

18